***********
The Full Commission reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioners Pfeiffer and DeLuca, and the briefs and oral arguments before the Full Commission. The appealing party has shown good ground to reconsider the evidence in this matter. Having reconsidered the evidence, the Full Commission reverses the Deputy Commissioner's denial of benefits and enters the following Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matter of law the following, which were entered into by the parties as:
 STIPULATIONS
1. The parties are subject to and bound by the North Carolina Workers' Compensation Act.
2. All parties have been correctly designated and there is no question as to misjoinder and nonjoinder of parties.
3. An employer-employee relationship existed between the plaintiff and defendant-employer on the date of the alleged injuries.
4. Plaintiff's compensation rate is $413.33, pursuant to N.C. Gen. Stat. § 97-2.
5. Salter Path Fire Rescue was insured for Workers' Compensation coverage by the Volunteer Safety Workers' Compensation Fund on September 30, 2001.
6. Plaintiff received unemployment benefits in the amount of $139.00 per week for a period of 17 weeks (December 29, 2001 through May 4, 2002).
7. Plaintiff received $300.00 per week from the period of October 1, 2001, through October 28, 2001, in employer-sponsored disability benefits.
8. Plaintiff received $486.26 per week for the period of October 29, 2001, through July 12, 2002, in employer-sponsored disability benefits.
9. The parties stipulated into evidence a packet of medical records labeled stipulated medical records, consisting of 50 pages of plaintiff's medical records.
 ***********
Based upon all the competent evidence of record, the Full Commission makes the following additional:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was 45 years old. Plaintiff was an EMT and captain of the Salter Path Fire and Rescue Department EMS, and had been a volunteer with the fire and rescue squad for approximately twenty years. Plaintiff's job duties with Salter Path included making sure the ambulance was clean and stocked, supervising the EMT's, and making sure calls were run correctly. Plaintiff's "regular" job was as a waitress in a restaurant.
2. Plaintiff was injured at the Salter Path Fire and Rescue Fun Day on September 30, 2001. Fun Day was essentially an appreciation day, in which the community thanked volunteer firemen and rescue workers for their contribution and work in the community. The purpose for Fun Day was to boost the morale and goodwill of Salter Path volunteers, show appreciation for the unpaid volunteers of Salter Path, and to help develop camaraderie among the volunteers. Fun Day was initiated in 2000.
3. The Fun Day event was put on by Salter Path Fire and Rescue Corporation and was paid for out of a Special Donations Fund, rather than out of the Department's operating budget. Salter Path Fire and Rescue Corporation paid for the admission of the volunteers and their families to Lost Treasures Golf and Raceway ("Lost Treasures"), the private amusement park where Fun Day was held, and provided lunch to the participants while at Fun Day.
4. Fun Day was a voluntary event, but Salter Path volunteers and their families were urged to attend if possible. Many volunteers did not attend. Those in attendance signed in at the Treasure Island main window and were given passes for free rides and a free lunch. One purpose of this sign-in sheet was to allow Treasure Island to compute the total cost, according to the discount ticket rates provided. Another possible purpose was to give management of the fire and rescue unit an attendance log. Notwithstanding that attendance was voluntary, Salter Path did keep attendance for the event. The employer received a tangible benefit from this event in that it helped to improve morale of volunteers and it provided an opportunity for leaders of the fire and rescue unit to encourage volunteers to continue their participation as volunteers. The volunteers viewed Fun Day as a benefit of their voluntary employment. The Chief of Salter Path, Ritchie Frost, told plaintiff that he wanted her to attend Fun Day.
5. On the morning of September 30, 2001, plaintiff called Carteret County Communications ("Communications") to tell the dispatcher to set the tones for noon for all of the volunteers' beepers to remind them of Fun Day. Plaintiff and her husband then took the Salter Path Fire 
Rescue ambulance to Treasure Island and proceeded inside to ride the go-carts. Plaintiff had signed in as "on duty" prior to her injury and had intended to give a pep speech thanking the EMS volunteers and encouraging their continued participation with Salter Path just as she had done at the previous Fun Day.
6. Plaintiff was riding the go-carts for approximately one hour before she was injured. As she rounded a corner on the go-cart track, plaintiff encountered a pile-up involving several other go-carts in front of her. She was unable to avoid the pile-up and struck a go-cart in the side. Plaintiff was wearing a seatbelt at the time and remained in her seat during the accident.
7. Plaintiff was taken out of the go-cart by the Salter Path EMS and transported to the hospital. Upon her release from Carteret General Hospital, she was diagnosed with a cervical strain and thoracic strain/contusion. She was given instructions to apply a heating pad to the painful areas, was prescribed Percocet and Flexeril for her pain, and told to follow up with Dr. Reece in two days if her pain had not improved. Plaintiff was seen by Dr. Shanton, who is in the same practice with Dr. Reece, on October 3, 2001, because her pain had not improved. Dr. Shanton noted decreased range of motion of the neck and spine. Dr. Shanton also diagnosed a cervical strain/thoracic strain and prescribed Flexeril and Reflafen for plaintiff's pain.
8. Plaintiff returned to Dr. Shanton on October 9, 2001, complaining of left arm, neck, upper back pain and scapula pain. Dr. Shanton told her to continue with the current pain medications and that he was setting her up for physical therapy. Plaintiff participated in physical therapy at Craven Regional Medical Center during the period of October 11, 2001, through November 6, 2001.
9. Plaintiff was seen by Dr. Shanton on October 12, 2001, and he told her to continue with pain medications (Flexeril and Percocet) and physical therapy. Plaintiff returned to Dr. Shanton on October 22, 2001, complaining of continued neck and shoulder pain. Dr. Shanton instructed plaintiff to continue with the pain medications and physical therapy, and told her that Dr. Reece would evaluate her in the near future.
10. Plaintiff was evaluated by Dr. Reece on October 23, 2001. Dr. Reece diagnosed plaintiff with mild myofascial syndrome of the neck. He told plaintiff to continue with pain mediations (Percocet, Flexeril and Relafen) and physical therapy. Dr. Reece sent plaintiff for an MRI of her neck. Plaintiff returned to Dr. Reece on November 13, 2001, to go over the results of her MRI. She presented at this appointment with chronic neck, posterior shoulder, and trapezius area pains. The MRI revealed central canal stenosis at C4-5 and C5-6. Dr. Reece's note from November 13, 2001, indicated, and the Full Commission finds as fact, that the neck condition is chronic for degenerative arthritis and that the accident on September 30, 2001, aggravated this condition. Dr. Reece told plaintiff to continue with her pain medications, and referred her to Dr. J. Ross Shuping, a neurosurgeon in Greenville.
11. Plaintiff presented to Dr. Shuping on November 16, 2001, complaining of pain in her neck, spreading up to the head and down the left arm. Dr. Shuping diagnosed plaintiff with a cervical strain. He changed the Flexeril to Pamelor, changed the Percocet to Vicodin, and prescribed additional physical therapy. On December 10, 2001, Dr. Shuping had a telephone discussion with plaintiff, who told him that she was continuing physical therapy, using hot soaks and massage therapy. Dr. Shuping told plaintiff to continue her pain medications.
12. Plaintiff was examined again by Dr. Shuping on January 12, 2002. Plaintiff reported continued pain in the neck and shoulders and a severe inability to do housework or to return to work either in her waitress job or as a volunteer with Salter Path. Dr. Shuping re-evaluated plaintiff on January 16, 2002, and diagnosed her with a cervical strain and severe pain syndrome with insomnia. Dr. Shuping continued the Vicodin and began plaintiff on Protriptyline. Dr. Shuping told plaintiff that her recovery "would be a slow process."
13. On March 4, 2002, Dr. Shuping wrote a note indicating that plaintiff's large breasts were increasing her neck and shoulder pain and referred her to a plastic surgeon for evaluation of a possible breast reduction. Plaintiff testified that Dr. Shuping raised the issue of a breast reduction with her and that she had never considered such a procedure prior to the September 30, 2001, accident. Plaintiff returned to Dr. Shuping on March 13, 2002, complaining of severe neck and shoulder pain. Dr. Reece indicated that "it may be getting worse," and took plaintiff off of the Pamelor and prescribed Klonopin.
14. Plaintiff was examined by Dr. Rizzuti, a plastic surgeon, regarding a possible breast reduction on March 14, 2002. Dr. Rizzuti told Plaintiff that a breast reduction would help reduce some of her neck and back pain related to the compensable accident.
15. Plaintiff was seen again by Dr. Shuping on March 23, 2002, for situational depression and pain. Dr. Shuping indicated, and the Full Commission finds as fact, that her inability to go back to work and inability to enjoy anything she used to do were, among other things, causing her depression. Dr. Shuping told Plaintiff to continue on the Klonopin and prescribed Prozac. This was the first time Plaintiff had ever taken any anti-anxiety or anti-depression medication. On April 8, 2002, Dr. Shuping wrote a note indicating that a breast reduction is medically needed to help with plaintiff's neck, shoulder, and back pain, resulting from her compensable accident.
16. On October 3, 9, 12, and 22, 2001, plaintiff treated with Dr. Shanton for neck pain and back pain. Dr. Shanton prescribed medications and physical therapy for plaintiff.
17. Plaintiff then treated with Dr. Donald B. Reece, her family physician. On November 13, 2001, Dr. Reece stated that an MRI scan of the cervical spine showed central canal stenosis of C4-5 and C5-6 with no evidence of acute herniation and moderate degenerative disc disease. Dr. Reece called plaintiff's condition "chronic degenerative arthritis that may have been aggravated by the accident." Dr. Reece opined that surgery would not help.
18. Plaintiff had a telephone consultation with Dr. J. Ross Shuping of East Carolina Neurology on December 10, 2001. Plaintiff was continuing with physical therapy, hot soaks, and massage therapy. Plaintiff said her pain was down to a level of seven from its previous level of ten. Plaintiff's symptom review was negative for any specific change in neurological function.
19. Dr. Shuping made a house-call to plaintiff's home on January 12, 2002, for additional evaluation. Plaintiff continued to complain of severe pain in the neck and shoulders, severe inability to do housework, go back to work or carry on any useful activities. Dr. Shuping diagnosed plaintiff with continued severe pain syndrome related to cervical pain, accidental injury and contusions.
20. Plaintiff also underwent a thoracic spine MRI on January 16, 2002, which revealed mild degenerative thoracic disc disease with posterior bulging at T7-8 and less at T4-5. No significant cord or root compression was identified. Plaintiff also suffered from degenerative anterior disc bulging at T9-10 and T10-11 with no evidence of compression fracture. Dr. Shuping stated at plaintiff's next visit on January 16, 2002, that the CT scan showed minor bulges, no myelopathy, and no nerve root compression.
21. At her March 13, 2002, evaluation with Dr. Shuping, plaintiff claimed her severe neck and shoulder pain was getting worse.
22. Plaintiff also treated with Dr. Richard P. Rizzuti on March 14, 2002, upon referral by Dr. Shuping. Plaintiff had suffered from mammary hypertrophy and had allegedly developed a worsening of pain since her injury of September30, 2001. The record documents that plaintiff had back pain prior to the injury.
23. When Dr. Shuping saw plaintiff on March 23, 2002, she reported unbearable pain and incredible depression over the loss of her daughter-in-law's fetus, a house fire, an injury to her dog, her inability to return to work, her inability to enjoy anything, and the fact that she felt "hollow and empty." Dr. Shuping diagnosed plaintiff with cervical strain and severe situational depression. Dr. Shuping referred plaintiff to a pain clinic.
24. Plaintiff saw Dr. Donald L. Price Jr., at East Carolina Neurology on July 12, 2002 complaining of constant pain. Dr. Price reviewed plaintiff's objective diagnostic testing, and noted that a cervical spine MRI had been negative. He diagnosed plaintiff with refractory neck pain, possibly related to previous injury, and significant depression. He recommended a psychiatric referral.
25. At the conclusion of her examination, Dr. Price reported that he found no indication or evidence for total disability.
26. Plaintiff then returned to Dr. Reece for a new referral to Coastal Physical Medicine and Rehabilitation Services in New Bern, North Carolina, for treatment with Dr. Angelo A. Tellis.
27. On September 16, 2002, plaintiff presented with complaints of chronic pain. Dr. Tellis noticed a normal neurological exam of the upper extremities. He diagnosed plaintiff with regional myofascial syndrome. He recommended outpatient physical therapy focused on myofascial release of key areas of her cervical and thoracic spine. He stated that plaintiff's symptoms were probably initiated with her cervical and thoracic strain/sprain following the accident on September 30, 2001. He stated that plaintiff may have micro-tearing of muscular and ligamentus fibers, which caused the development of her myofascial pain symptoms.
28. Dr. Tellis further stated that he doubted plaintiff could return to work as a waitress at that time due to the need to lift fairly heavy trays and do repetitive bending and twisting. Dr. Tellis recommended that plaintiff be limited to mainly sedentary activities while allowing frequent position changes. He stated that plaintiff should do no overhead activity and should avoid lifting anything greater than 10 pounds, and should avoid repetitive bending or twisting.
29. On October 8, 2002, Dr. Tellis recommended outpatient therapy, stretching techniques, a home exercise program, cervical traction, and a TENS unit trial. Plaintiff's last visit was on December 4, 2002. Dr Tellis noted at that time that plaintiff's treatment modalities had provided some relief, and that plaintiff indicated the pain was not constant, but that she had good and bad days.
30. Plaintiff has continued to present to Dr. Reece, seeing him on December 5 and 30, 2002, January 30, 2003, February 25, 2003, March 3, 8, and 25, 2003, and April 21, 2003. According to Dr. Reece, plaintiff improved during the December-through-April time period. Dr. Reece indicated in his April 21, 2003, notes that plaintiff could perform sedentary activities at work.
31. The greater weight of the evidence does not support a finding that plaintiff is now unable to work by reason of her compensable injuries.
32. Plaintiff's back problems and the exacerbation of such back problems by her large and weighty breasts pre-existed her compensable injuries. Defendants are not responsible for any suggested breast reduction surgery.
 ***********
Based upon the above stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. Plaintiff suffered an injury by accident on September 30, 2001, arising out of and in the scope of her employment with the defendant-employer. N.C. Gen. Stat. § 97-2(6).
2. To determine whether an injury sustained at an employer-sponsored recreational and/or social activity arose out of and in the course and scope of employment, the North Carolina Court of Appeals has adopted the test set out in Larson, Workmen's Compensation Law § 22.23, p. 5-85.Chilton v. School of Medicine, 45 N.C. App. 13, 262 S.E.2d 347 (1980). The Chilton court stated that the relevant questions are as follows:
(1) Did the employer in fact sponsor the event?
(2) To what extent was attendance really voluntary?
(3) Was there some degree of encouragement to attend evidenced by factors such as:
i. Taking a record of attendance;
ii. Paying for the time spent;
iii. Requiring the employee to work if he did not attend; or,
iv. Maintaining a known custom of attending?
(4) Did the employer finance the occasion to a substantial extent?
(5) Did the employees regard it as an employment benefit to which they were entitled as of right?
(6) Did the employer benefit from the event, not merely in a vague way through better moral and goodwill, but through such tangible advantages as having an opportunity to make speeches and awards?
In Chilton, the N.C. Court of Appeals found that the plaintiff was not entitled to compensation for a broken ankle suffered while playing volleyball at an annual picnic. Chilton, supra, 45 N.C. App. 13,262 S.E.2d 347. The Chilton court found that it was not clear whether the defendant sponsored the picnic; attendance was voluntary; no record of attendance was taken; participants were not paid for time spent at the picnic; employees were not required to work if they did not attend the picnic; the picnic was not regarded as a benefit to which the plaintiff felt entitled; and the defendant did not use the picnic as an opportunity to give a "pep" talk or grant awards. Id. at 17-18, 262 S.E.2d at 350.
Three years later, the Court of Appeals again addressed the issue of whether an employee's injury at an employer-sponsored social activity had arisen in the course and scope of employment. Martin v. MarsManufacturing Company. Inc., 58 N.C. App. 577; 293 S.E.2d 816 (1982). The Martin court reiterated the applicable six-question test set out inChilton and noted that the plaintiff in Chilton was not entitled to compensation because "none of these questions could be answered affirmatively." Id. at 579, 293 S.E.2d at 818.
The plaintiff in Martin permanently injured her ankle while dancing at the employer's annual holiday party. Id. at 578, 203 S.E.2d at 817. Applying the six-question test set out in Chilton, the Martin court held that the plaintiff was able to demonstrate that: (1) the event was sponsored by the defendant (question 1); (2) the employees were encouraged to attend (question 3); (3) the defendant paid all expenses (question 4); and, (4) the defendant benefited from the event by having an opportunity to make speeches and present awards (question 6). Id. at 579,293 S.E.2d at 817. The Martin court concluded that establishing affirmative answers to four of the six Chilton questions was a "sufficient nexus" to award compensation to the injured plaintiff. Id. at 580, 293 S.E.2d at 818.
3. As in Martin, the evidence in the instant cause establishes affirmative answers to at least four of the six Chilton questions, and, arguably, all six:
(1) Did the employer in fact sponsor the event?
Yes. Salter Path organized and sponsored the Fun Day event.
(2) To what extent was attendance really voluntary?
Plaintiff does not dispute that most "employees" of Salter Path deemed Fun Day to be voluntary. In fact, everything that every "employee" did for Salter Path was voluntary. Salter Path is a volunteer fire department and rescue squad. It was voluntary to sign up as a fireman or EMT in the first place. It was voluntary to participate in training activities. It was voluntary to show up for an emergency call. Unlike most employees who are motivated by economic gain, Salter Path's "employees" are motivated by their sense of obligation to the community. Joey Frost summed it up best under cross examination at the hearing:
A volunteer is a very unique person. A volunteer doesn't get paid for his time that he puts in as the training you do. He doesn't get paid as far as keeping the maintenance up on the trucks. He doesn't get paid for it, but how he gets paid is knowing he's helped someone from not getting hurt or saving a person's property.
Despite the voluntary nature of Salter Path's operations, Plaintiff justifiably believed that her attendance at Fun Day was mandatory. Plaintiff was Captain of Salter Path's EMS. As Captain, she felt obligated to be seen by her subordinates. In addition, in terms of whether the event was really voluntary or not for Plaintiff, it should be noted that Plaintiff did not just attend Fun Day. Instead, she undertook a greater responsibility than other "employees" of Salter Path. Specifically, she called Carteret County Communications to get the dispatcher to page all Salter Path employees to remind them about the event. Also, Plaintiff let the dispatcher know she was in service, and, along with her husband, took the ambulance (the same ambulance used to take her to the hospital) to Fun Day from the station.
Furthermore, it was undisputed that Salter Path's Chief told Plaintiff he wanted her to go. In most employer-employee relationships, such a statement by the top person in the organization transforms the voluntary nature of the event into one in which the employee feels obligated to attend. Consequently, Fun Day was not really voluntary for Plaintiff due to the extra responsibility she undertook and the request from the Chief that she attend.
(3) Was there some degree of encouragement to attend?
In addition to the Chief's telling Plaintiff that he wanted her to attend the Fun Day as mentioned in the preceding paragraph, all three witnesses at the hearing testified to some level of encouragement of the volunteers to attend the event. Plaintiff testified that all volunteers were encouraged (and had been encouraged for approximately three months) to attend Fun Day, and she specifically encouraged all of her subordinates to attend. A record of attendance was kept was kept for Fun Day.
Even the defendants' own witness, Taffie Baysden, testified that volunteers were encouraged to attend if they could. In addition, Ms. Baysden ultimately testified that there was a record of attendance (which she previously had denied on direct examination). In fact, she acknowledged that the names of attendees were recorded in Salter Path's login book as well as a separate sign-in sheet at the check-in window at Lost Treasures.
(4) Did the employer finance the occasion to a substantial extent?
Yes. Salter Path paid for the Fun Day event. Salter Path paid the admission for the volunteers and their families into Lost Treasures and paid for their lunch that day.
(5) Did the employees regard it as an employment benefit to which theywere entitled as of right?
Yes. Fun Day was a benefit for the volunteers and their families. If volunteers did not keep their hours up, they could not attend. Only active members of Salter Path were allowed to go.
(6) Did the employer benefit from the event, not merely in a vague waythrough better moral and good will, but through such tangible advantagesas having an opportunity to make speeches and awards?
Yes. While Fun Day certainly was designed to foster better morale and good will among Salter Path's "employees" (which has a more significant meaning for volunteers who often are awakened in the middle of the night and who are asked to put their lives on the line), Plaintiff intended to use her position as Captain to give a pep talk to the volunteers under her charge. Specifically, Plaintiff was going to make a speech to her EMS workers to thank them for their participation and to encourage continued participation from these volunteers within the department. Joey Frost confirmed that Plaintiff made such a speech the previous year and that she intended to make a speech on September 30, 2001 before she was injured. Salter Path benefited in a tangible manner (i.e., volunteer retention).
In that Salter Path is a volunteer organization and only so much leverage can be placed upon the volunteers in the first place, the case at bar presents a stronger position for compensability than even theMartin case in which the Court of Appeals found in the employee's favor. Consequently, the Full Commission finds that Plaintiff was injured by accident arising out of and in the course and scope of her employment with Salter Path.
4. Plaintiff is entitled to temporary total disability compensation at the rate of $413.33 for those periods of time when she was unable to work for Salter Path by reason of her compensable injuries. She was unable to work by reason of her compensable injuries from September 30, 2001, through April 21, 2003, when Dr. Reece found that she was capable of sedentary work. Defendants are entitled to credits for unemployment benefits in the amount of: $139.00 per week for a period of 17 weeks (December 29, 2001, through May 4, 2002); $300.00 per week from the period of October 1, 2001 through October 28, 2001, in employer-sponsored disability benefits; and $486.26 per week for the period of October 29, 2001, through July 12, 2002, in employer-sponsored disability benefits. These credits are week-for-week and not dollar for dollar. N.C. Gen. Stat. § 97-42.
5. Plaintiff is entitled to medical compensation for all medical treatment rendered by reason of her compensable injuries. N.C. Gen. Stat. § 97-25
6. Plaintiff's attorney is entitled to a reasonable fee of twenty-five (25%) of all disability compensation ordered paid to plaintiff.
 ***********
Based on the above stipulations, findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Subject to an attorney fee of 25% of compensation due plaintiff (after offset for credits) defendants shall pay to plaintiff $413.33 per week for the period September 30, 2001, through April 21, 2003, less $300.00 per week from the period of October 1, 2001 through October 28, 2001, less $139.00 per week for each week from December 29, 2001, through May 4, 2002, less $413.33 per week for the period of October 29, 2001, through July 12, 2002 (although the disability benefits funded by the employer were $486.26 per week, since the statute limits credits to a week for week basis rather than dollar for dollar, the maximum allowable credit is the weekly compensation due). Since these amounts have accrued, they shall be paid in a lump sum, with interest at 8 percent per year from March 31, 2003, until paid.
2. Defendants shall pay the 25% attorney fee directly to plaintiff's attorney.
3. Defendants shall pay or reimburse those who paid, all reasonable medical costs in connection with plaintiff's compensable injuries, with the amounts capped at the allowable amounts in the N.C. Workers Compensation Medical Fee Schedule.
4. Defendants shall pay the costs.
This 26th day of January 2005.
 S/_____________ THOMAS J. BOLCH COMMISSIONER
CONCURRING:
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
 S/_______________ DIANNE C. SELLERS COMMISSIONER